# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Upper River Services, L.L.C., <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> Andrew Heiderscheid, <br><br> Defendant/Counter-Claimant. | Case No. 19-cv-00242 (SRN/ECW) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Giles B. Howard and Neal W. Settergren, Goldstein & Price, L.C., One Memorial Drive, Suite 1000, St. Louis, MO 63102, for Plaintiff/Counter-Defendant.

Brett Koch, Gerald W. Bosch, and Mackenzie R. Moy, Bosch Law Firm, Ltd., 3900 Northwoods Drive, Suite 120, St. Paul, MN 55112, for Defendant/Counter-Claimant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Plaintiff Upper Rivers Services, L.L.C.'s Motion for Partial Summary Judgment [Doc. No. 45] and Defendant Andrew Heiderscheid's Motion for Summary Judgment [Doc. No. 55]. Both Motions seek to determine whether Heiderscheid was employed as a "seaman" at the time of an alleged injury he incurred while working for URS. (*See* Pl. Mot. for Partial Summ. J. [Doc. No. 45] at 1; Def. Mot. for Summ. J. [Doc. No. 55] at 1.) Upper River Services contends that Heiderscheid is a "seaman" for the purposes of federal maritime law, while Heiderscheid asserts that he was a land-based laborer at the time of injury. (Pl.'s Mem. in Supp. of Summ J. ("Pl.'s Mem.) [Doc. No. 47] at 1–2; Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ J. and in Supp. of Def.'s Mot. for Summ. J. ("Def.'s

Mem.") [Doc. No. 53] at 1–2.) For the following reasons, the Court **GRANTS** Upper River Services, L.L.C.'s Motion, **DENIES** Heiderscheid's Motion, and holds that Heiderscheid was employed as a seaman as the time of his alleged injury.

## I.    BACKGROUND

This case involves a dispute between a harbor towing service that operates upon the navigable waters of the United States—namely, "the meanderings of the mighty Mississippi[,]" *Anderson-Tully Co. v. Murphree*, 153 F.2d 874, 882 (8th Cir. 1946)—and one its former employees. The material facts are undisputed. Upper River Services, L.L.C. ("URS") is an inland harbor towing service that operates two shipyards and a fleet of vessels that move barges on the Mississippi River. (Isnardi Decl. [Doc. No. 47-4] at ¶ 2.) URS crews its vessels with deckhands, whose responsibilities include building tow, keeping vessels clean, removing barges from elevators, and delivering barges. (*Id.* at ¶ 5.) Generally, URS deckhands devote the entirety of their shifts to doing the vessel's work. (Heiderscheid Depo. Transcript, Pl. Ex. B ("Def. Depo.") [Doc. No. 47-3] at 10.)

Defendant Andrew Heiderscheid applied for a deckhand position at URS on October 22, 2018. (*Id.* at 7–8.) He was hired in November 2018 and worked exclusively as a deckhand from November through December 2018. (*Id.* at 13–14.) In conjunction with his hire, Heiderscheid received computer-based orientation training for new vessel employees, as well as additional training on URS vessels themselves that focused on how to be a deckhand. (*Id.* at 6–9.) While working as a deckhand, he crewed at least four of URS's vessels, all operated out of St. Paul, and spent his time accomplishing the vessels' mission of towing barges

between docks and line boats for later navigation up and down the Mississippi River. (*Id.* at 10–12.)

Every year, ice and other winter conditions cause the locks and dams on the Mississippi River to close in early December. (Isnardi Decl. at ¶¶ 6–7.) These closures prevent towboats, like the vessels in URS's fleet, from moving barges downriver. (*Id.*) As a result, although URS's fleet of vessels remain in the water and in navigation, URS ceases normal operations in December. (*Id.*) Because normal operations are suspended, URS's deckhands are typically laid off while the locks are closed. (Def.'s Depo. at 16.) Once winter conditions pass, and the locks reopen, the deckhands are usually recalled back to work for URS. (*Id.*)

URS closed for the season on December 20, 2018. (*Id.* at 14.) Up until that time, Heiderscheid continued his work as a deckhand for URS, spending his time onboard URS's vessels helping break ice and move barges. (Isnardi Decl. at ¶ 8.) When URS closed for the season, Heiderscheid requested that he be permitted to continue working during the off-season because of his purported ineligibility for unemployment benefits. (*Id.* at ¶ 8; *see also* Def.'s Depo. at 16–17.) URS obliged, and permitted Heiderscheid to temporarily shift his work to shoreside duties. (Isnardi Decl. at ¶ 9.) Heiderscheid acknowledged that this shift was temporary, and that once winter conditions abated and the locks and dams reopened, he would return to working aboard URS's vessels. (Def.'s Depo. at 19 (Defendant acknowledging temporary nature of shoreside work).) Heiderscheid's shift to shoreside work did not require him to fill out any new paperwork, submit any additional documentation to URS, or change his pay. (Def.'s Depo. at 17–18, 20.) Additionally, because URS's vessels

remained in the water and in navigation, if there had been an emergency or one of URS's vessels required a crew during the off-season period, Heiderscheid would have been called upon to work as a deckhand.  (Isnardi Decl. at ¶ 9.)

Heiderscheid worked shoreside for URS for ten days.  (*Id.* at ¶ 9; Def.'s Depo. at 19.) On January 21, 2019, Heiderscheid alleges that he was injured while picking up and throwing a piece of metal.  (Def.'s Depo. at 20.)  Heiderscheid filled out an injury report—dated January 29, 2019—in which he described his job as a "deckhand."  (*Id.* at 31, 33.)  That same day, URS terminated Heiderscheid for allegedly misrepresenting the cause and date of his injury to URS.  (*See* Compl. [Doc. No. 1] at ¶¶ 8–9.)  URS notes that Heiderscheid worked a total of 402.75 hours for the company, and that 236 of those hours (or 59%) were on URS vessels in navigation.  (Isnardi Decl. at ¶ 12.)

On January 31, 2019, Heiderscheid filed a claim petition for workers' compensation benefits with the Minnesota Office of Administrative Hearings.  (*See* Pl. Ex. A, *Heiderscheid v. Upper River Services et. al.*, No. 12182473-CP-9291 at 1 (Minn. Workers' Comp. June 12, 2019) ("Workers' Comp. Findings and Order") [Doc. No. 47-2].)  On February 1, 2019, he underwent back surgery, which was generally successful.  (Def.'s Depo. at 58–59.)  That same day, URS filed this case seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 (2012), that Heiderscheid was employed as a seaman governed by federal maritime law, not state law, and that URS has no liability to Heiderscheid to pay maintenance and cure to him or on his behalf.  (Compl. at ¶ 15(b).)  Heiderscheid denies that he was a seaman at the time of his alleged injury and instead contends that he was a "land-based laborer in [URS's] maintenance department" when he was injured.  (Am. Answer [Doc. No. 26] at ¶ 5.)  As a

result, he denies that his injury is exclusively covered under federal maritime law and contends that the Minnesota Office of Administrative Hearings has jurisdiction to address his entitlement to workers' compensation benefits. (*Id.* at ¶ 9.) In the alternative, if he were to be declared a seaman for the purposes of federal maritime law, Heiderscheid also filed a counterclaim alleging negligence under the Jones Act, 46 U.S.C. § 30104 (2012) and unseaworthiness, maintenance, and cure under general maritime law. (*Id.* at Dkt. 5–6.)

On June 12, 2019, a Minnesota workers' compensation judge dismissed Heiderscheid's claim petition for lack of subject matter jurisdiction. (*See* Workers' Comp. Findings and Order at 5.) The judge determined that "if [Heiderscheid] is found to be a seaman, the Jones Act provides his exclusive remedy and [he] cannot seek Minnesota workers['] compensation benefits." (*Id.* at 7.) However, the judge noted that while Heiderscheid's argument that he is not a seaman under the Jones Act "may ultimately prove fruitful . . . it is not for the Compensation Judge to make that determination" as the judge only "has jurisdiction to questions of law and fact arising under Minnesota workers' compensation law and thus lacks jurisdiction to determine whether the employee is a seaman under the Jones Act." (*Id.* at 8.) Accordingly, the judge dismissed Heiderscheid's claim petition, but noted that because he had not ruled on the merits of Heiderscheid's claim, if jurisdiction was ultimately resolved in Heiderscheid's favor, he could "refile his claim for Minnesota workers' compensation benefits and would not be barred by res judicata." (*Id.* at 8–9.)

URS subsequently filed the present Motion for Partial Summary Judgment requesting that the Court hold that Heiderscheid was employed as a seaman at the time of his alleged injury on January 21, 2019. (Pl.'s Mot. for Summ. J. [Doc. No. 45].) Heiderscheid then filed

a Motion for Summary Judgment requesting that the Court hold he was *not* a seaman at the time of his injury. (Def.'s Mot. for Summ. J. [Doc. No. 55].) The Court heard oral argument on the motions on January 9, 2020. (*See* Minute Entry [Doc. No. 63].)

## II.    DISCUSSION

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' " if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc*., 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Cor*p., 475 U.S. 574, 587 (1986). In responding to a motion for summary judgment, however, the nonmoving party may not "'rest on mere allegations or denials,' but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

Here, both parties move for summary judgment on the same issue: Whether Heiderscheid was a "seaman" at the time of his injury. Accordingly, each party "concedes and affirms that there is no issue of fact only for purposes of [their] own motion." *Allied Mut. Ins. Co. v. Lysne*, 324 F.2d 290, 292 (8th Cir. 1963) (citation omitted) (internal

quotation marks omitted). Normally, whether someone is a "seaman" for the purposes of maritime law constitutes a "mixed question of law and fact. Because statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the appropriate standard. On the other hand, if reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). Here, however, the material facts are undisputed, so the Court may rule on the question as a matter of law. *See Johnson v. Continental Grain Co.*, 58 F.3d 1232, 1235 (8th Cir. 1995); *Abshire v. Seacoast Prods., Inc.*, 668 F.2d 832, 835 (5th Cir. 1982) (noting that where "no facts [are] in dispute" a court may rule on the question of "seaman" status "as a matter of law").

The parties' motions essentially boil down to two questions: (1) Was Heiderscheid a "seaman" while working for URS during the normal operating season; and, if so, (2) did Heiderscheid retain his "seaman" status during his temporary assignment to shore-based duties during URS's off-season? The Court addresses each issue in turn.

## A. The Jones Act, the LHWCA, and Heiderscheid's "Seaman" Status Prior to Temporary Shoreside Assignment

The Court first addresses whether Heiderscheid ever possessed "seaman" status while working for URS. Prior to 1920, general maritime law provided that "seaman were entitled to 'maintenance and cure' from their employer for injuries incurred 'in the service of the ship' and to recover damages from the vessel's owner for 'injuries received by seamen in consequence of the unseaworthiness of the ship,' but they were 'not allowed to recover an indemnity for the negligence of the master, or any member of the crew.' " *Chandris, Inc.*,

515 U.S. at 354 (quoting *The Osceola*, 189 U.S. 158, 175 (1903)). In 1920, however, Congress enacted the Jones Act, which "remove[d] the bar to suit for negligence articulated in *The Osceola*," and provided "a cause of action for negligence for 'any seaman' injured 'in the course of his employment.' " *Id.* (citation omitted). Codified at 46 U.S.C. § 30104 (2012), the Jones Act's negligence provision states:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

*Id.* The Jones Act did not, however, define the term "seaman," instead leaving it up to the courts. *Chandris, Inc.*, 515 U.S. at 355.

In 1927, Congress enacted the Longshore and Harbor Workers' Compensation Act (LHWCA), which provides "scheduled compensation (and the exclusive remedy) for injury to a broad range of *land-based* maritime workers but which also explicitly excludes from its coverage 'a master or member of a crew of any vessel.' " *Id.* at 355 (citation omitted); *see* 33 U.S.C. § 901 *et. seq.* (2012). In doing so, Congress placed a "key requirement for Jones Act coverage" in a completely different statute, and expressly excluded from LHWCA coverage "those properly covered under the Jones Act." *Chandris, Inc.*, 515 U.S. at 355–56. (citation omitted) (internal quotation marks omitted). Essentially, Congress created two "mutually exclusive compensation regimes" for "seamen" and land-based maritime workers. *Chandris, Inc.*, 515 U.S. at 355–56. First, under the Jones Act, a maritime employee who qualifies as a "seaman" is granted the right (to the exclusion of other rights) to pursue his or her employer for negligence when he is injured in "the course of employment." 46 U.S.C. § 30104;

*Chandris, Inc.*, 515 U.S. at 356 (noting that a "seaman," i.e., a "master or member of a crew" is excluded from LHWCA coverage). However, maritime employees who do not qualify as "seamen" are granted the rights (to the exclusion of other rights) set forth in the LHWCA, namely scheduled compensation. *See Chandris, Inc.*, 515 U.S. at 356; 33 U.S.C. §§ 902 (excluding from its coverage a "master or member of a crew of any vessel"), 903(a) (providing compensation for disability or death), 905 (noting that LHWCA liability is exclusive), 907–909 (requiring employer to furnish medical services and supplies, disability compensation, or compensation for death). The difficult task, as the Supreme Court has noted, is identifying "those maritime workers who should qualify as [] seamen and those who should not[,]" particularly in light of the " 'myriad [of] circumstances in which men go upon the water' " and the wide " 'spectrum [of employees] ranging from the blue-water seaman to the land-based longshoreman.' " *Chandris, Inc.*, 515 U.S. at 356 (quoting *Brown v. ITT Rayonier, Inc.*, 497 F.2d 234, 236 (5th Cir. 1974)).

Despite this difficulty, the Supreme Court has sought to clarify the appropriate "basic principles regarding the definition of a seaman." *Id.* at 358. "First, '[w]hether under the Jones Act or general maritime law, seamen do *not* include land-based workers." *Id.* (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991)) (emphasis added). "Through the LHWCA," the Court noted, "Congress explicitly denied a right of recovery under the Jones Act to maritime workers not members of a crew who are injured on board a vessel." *Id.* at 359 (citation omitted) (internal quotation marks omitted). Second, "Jones Act coverage . . . depends 'not on the place where the injury is inflicted . . . but on the nature of the [purported] seaman's service, his status as a member of the vessel, and his relationship as

such to the vessel and its operation in navigable waters.' " *Id.* at 359–60 (quoting *Swanson v. Marra Bros.*, 328 U.S. 1, 4 (1946)).  As a result, "maritime workers who obtain seaman status do not lose that protection automatically when on shore and may recover under the Jones Act whenever they are injured in the service of the vessel, regardless of whether the injury occurs on or off the ship." *Id.* at 360.[1]  Put another way, the LHWCA " 'leaves unaffected the rights of members of the crew of a vessel to recover under the Jones Act when injured while pursuing their maritime employment whether on board . . . or on shore.' " *Id.* (quoting *Swanson*, 328 U.S. at 7–8).

These two basic principles—"well settled after decades of judicial interpretation"—establish that the "Jones Act inquiry is fundamentally status based: Land-based maritime workers do not become seamen when they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361.  In the same vein, in order to avoid a classification of "seaman" that would permit "a worker to walk into and out of coverage in the course of his regular duties," the Court rejected the use of a "snapshot" test for seaman status that merely views the maritime workers' status "as it exists at the instant of injury[.]" *Id.* at 363 (citation omitted) (internal quotation marks omitted).  Rather, courts must search for "a more enduring relationship" between the worker and the vessel. *Id.* (citation omitted) (internal quotation

---

[1]      Indeed, the Court noted that the same principle remained true for land-based maritime workers who remain covered by the LHWCA even when injured on a vessel in navigation.  *Chandris, Inc.*, 515 U.S. at 360 (citing *Director, Officer of Workers' Comp. Programs v. Perini N. River Assoc.'s*, 459 U.S. 297, 300 n.4, 324 (1983)).  Land-based maritime workers "[do] not become a 'member of a crew' as soon as a vessel leaves the dock." *Id.* at 361.

marks omitted).  To hold otherwise, the Court noted, would permit a worker to "oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured," which would run counter to "the interest[s] of employers and maritime workers alike in being able to predict who will be covered by the Jones Act (and, perhaps more importantly for purpose of the employers' workers' compensation obligations, who will be covered by the LHWCA) before a particular workday begins." *Id.*  To that end, "the Jones Act remedy *may be available [even] to maritime workers who are employed by a shipyard and who spend a portion of their time working on shore* but spend the rest of their time at sea." *Id.* at 364 (emphasis added).

Keeping these principles in mind, the Court set forth a two-pronged test—designed to "focus upon the essence of what it means to be a seaman," *Id.* at 369—for evaluating whether the requirements for "seaman" status are satisfied.  "First, . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* at 368 (cleaned up).  This "threshold" requirement is "very broad: 'All who work at sea in the service of a ship' " are *eligible* for seaman status. *Id.* (quoting *Wilander*, 498 U.S. at 354). "Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.*  The "fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* at 368–69 (citation omitted).  To that end,

"[t]he duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because *the ultimate inquiry* is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happened to be working on the vessel at a given time." *Id.* at 370 (emphasis added). As a general "rule of thumb," the Supreme Court endorsed the Fifth Circuit's view that a worker "who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* at 371.

Applying the two-prong test set forth in *Chandris, Inc.*, Heiderscheid was clearly a seaman while working as a deckhand during URS's normal operating season; the parties do not appear to contend otherwise. Heiderscheid worked on board at least four URS vessels (and accordingly, worked for an "identifiable group of [] vessels," *id.* at 368) during the normal operating season, and while on board spent nearly all of his time accomplishing the vessels' mission of towing barges between docks and line boats for later navigation up and down the Mississippi River. (Def.'s Depo. at 10–12.) Accordingly, Heiderscheid was (1) "contribut[ing] to the function of [URS's] vessel[s]" as well as "the accomplishment of [the vessels'] mission," and (2) possessed a "substantial" connection to URS's vessels while in navigation both in terms of duration and nature, namely that nearly all of his time was spent ensuring URS's vessels completed their missions. *Chandris, Inc.*, 515 U.S. at 368. He was therefore a "seaman" while working for URS during the regular season.

### B. Heiderscheid's Status After Assignment to Temporary Shoreside Duties

The Court now turns to the second question in this case: whether Heiderscheid retained his "seaman" status after being temporarily reassigned to shoreside duties during URS's off-

season.  URS asserts that Heiderscheid retained his "seaman" status because the undisputed facts show that URS hired Heiderscheid to work as a deckhand, that 59% of his total number of hours worked for URS were on board its vessels furthering the vessels' mission, his assignment to shore duty was temporary and he would eventually have returned to work on board URS's vessels, and at all times during his land-based temporary work, Heiderscheid was subject to the call of URS's vessels, which remained in the water and in navigation.  (Pl.'s Mem. at 10.)  Heiderscheid argues in response that because his job duties changed—from work furthering URS's vessels' mission to land-based shop work—he is entitled to have his "seaman" status evaluated based on the time he spent working on land, not his overall employment with URS.  (Def.'s Mem. at 4.)

Heiderscheid is correct that "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well."  *Chandris, Inc.*, 515 U.S. at 372 (citation omitted).  To that end, "[if] a maritime employee receives a new work assignment in which his *essential* duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position."  *Id.* (citation omitted) (emphasis added).  However, Heiderscheid ignores case law that has expounded upon this rule.  The Fifth Circuit, for example, has noted that generally, "the status of an employee who splits time between land and a vessel is 'determined in the context of his *entire* employment with his current employer' " based on job reassignment  *Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 536 (5th Cir. 2015).  Where a change in job duties occurs, the Fifth Circuit has held that the worker's essential duties or work location must be " 'permanently changed' " before he is entitled to have the assessment of the substantiality of his vessel-related work

made on the basis of his activities in his new job. *Id.* (quoting *Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1075–76 (5th Cir. 1986) (en banc)). At the very least, the "reassignment exception" to considering an employee's total time with an employer "applies only when an employee has 'undergone a *substantial change* in status, not simply [by] serv[ing]' " on land sporadically. *Id.* (quoting *Becker v. Tidewater, Inc.*, 335 F.3d 376, 389 (5th Cir. 2003)). Indeed, to hold otherwise would run counter to the rule that "once it is established that [a person] is a seaman, the Jones Act permits recovery even if he sues for injuries received while off ship and engaged in temporary work for his employer unrelated to the service of the ship." *Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422, 433 (5th Cir. 1977) (citing *Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129 (1959)), *reversed on other grounds*, 436 U.S. 618 (1978); *see also Smith v. Odom Offshore Surveys, Inc.*, 791 F.2d 411, 415 (5th Cir. 1986) ("A seaman does not lose his status because he is temporarily assigned by his employer to duties off his vessel."); *cf. Heise v. Fishing Co. of Alaska, Inc.*, 79 F.3d 903, 906 (9th Cir. 1996) (holding that a "land-based maritime worker" did not become a "seaman" even when temporarily assigned to work aboard a ship).

Of course, that does not mean that a seaman assigned to shore duties " 'for a very long period of time would continue indefinitely to be a seaman merely because it is contemplated that he will someday return to the vessel[.]' " *Reeves v. Mobile Dredging & Pumping Co., Inc.*, 26 F.3d 1247, 1255 (3rd Cir. 1994) (quoting *Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 453 (5th Cir. 1980)). The question of whether "seaman" status has been retained requires consideration of how long the employee's temporary shoreside assignment lasts, its relationship to the employer's business, whether the employee was free to accept or reject it

without endangering his employment status, and "any other factors relevant to the ultimate inquiry[.]" *Odom Offshore Surveys, Inc.*, 791 F.2d at 415–16 (citation omitted) (internal quotation marks omitted).

Here, the undisputed facts establish that Heiderscheid's shore duties did not change his essential job duties, and therefore did not constitute a reassignment requiring consideration of his "seaman" status through the narrow lens of only his shore-based job duties. Heiderscheid's onshore work was entirely temporary, requested by him to fill what would normally be a period of unemployment during URS's off-season. (Isnardi Decl. at ¶ 8; *see also* Def.'s Depo. at 16–17, 19.) It was understood by all parties that this reassignment was temporary, and that Heiderscheid would return to URS's vessels as soon as the Mississippi River's dams and locks reopened. (Def.'s Depo. at 19.) Heiderscheid was not required to fill out any new paperwork or submit any additional documentation to URS related to his reassignment, and his pay remained the same. (*Id.* at 17–18, 20.) And perhaps most importantly, URS's vessels remained in the water and in navigation during Heiderscheid's shoreside duties, and he himself remained subject to the vessels' call should the need arise. (Isnardi Decl. at ¶ 9.) These undisputed facts show that far from an "essential change in duties," Heiderscheid remained "a seaman by conventional Jones Act criteria" who, at the time of his injury, simply "happened not to be on navigable waters." *Odom Offshore Surveys, Inc.*, 791 F.2d at 416 (citation omitted) (internal quotation marks omitted). Accordingly, the Court looks to Heiderscheid's entire period of employment in evaluating whether he retained his status as a "seaman" at the time of his injury.

In support of his argument that he was not a seaman at the time of injury, Heiderscheid relies heavily on an older Supreme Court case—*Desper v. Starved Rock Ferry Co.*, 342 U.S. 187 (1952)—which requires some discussion. In *Desper*, the Supreme Court addressed a facially similar situation to the present case. The employee at issue, Desper, was an operator of a fleet of sightseeing motorboats on the Illinois River; during the summer months, he operated the vessels on the river's waters. *Id.* at 188. However, when the season closed, Desper "helped take the boats out of the water and block them up for the winter." *Id.* When the boats were out of the water, his employment was terminated. *Id.*

The following spring, Desper was re-employed, and in the time leading up to the point where the boats would be put back in the water for the summer months, Desper was "put to [work] cleaning, painting, and waterproofing the boats, [and] preparing them for navigation." *Id.* However, before the boats were put back into the water, Desper was killed by an exploding fire extinguisher. *Id.* at 188–89. After noting that the facts of the case were particularly "unique," the Supreme Court held that Desper was not a "seaman" at the time of his death because he was, at that time, engaged in work that was "quite clearly [] not that usually done by a 'seaman'," and because the "boats were not afloat and had neither captain nor crew." *Id.* at 190. The Court further noted that the boats were undergoing seasonal repairs, and that "while engaged in such seasonal repair work Desper was not a 'seaman' within the purview of the Jones Act." *Id.* at 191. The fact that Desper was expected "in the future to be[] a seaman [did] not render maritime work which was not maritime in its nature." *Id.* (internal quotation marks omitted). Heiderscheid relies on *Desper* for the proposition that "if a maritime worker was previously performing duties typical of a seaman, and even if it

was expected that he may perform the duties of a seaman in the future, seaman status is based on the job duties and activities the worker was performing at the time of injury." (Def.'s Mem. at 5.) Because he was performing shop work at the time of his injury, Heiderscheid contends that he was not a "seaman" at that time.

The Court disagrees. Both legally and factually, *Desper* does not help Heiderscheid. First, from a legal standpoint, Heiderscheid ignores the fact that the Supreme Court has since refined *Desper*'s language, and expressly rejected Heiderscheid's reading of the case. In *Chandris, Inc.*, the Supreme Court explicitly rejected any sort of "snapshot" test that looked only to the work the employee was performing at the time of injury. 515 U.S. at 363. In doing so, the Court acknowledged its decision in *Desper*, and noted that while "some language in [*Desper*] does suggest that whether an individual is a seaman depends upon 'the activity in which he was engaged at the time of the injury,' *the context of that discussion* reveals that 'activity' referred to the worker's employment as a laborer on a vessel undergoing seasonal repairs while out of navigation, and not to his precise task at the time of injury." *Id.* at 362 (citation omitted). Accordingly, contrary to Heiderscheid's assertion, *Desper* does not stand for the proposition that Heiderscheid's precise task at the moment of his injury governs the issue. Second, *Desper* is factually distinguishable from the instant case. Unlike *Desper*, Heiderscheid remained employed by URS during the entire off-season, and was merely reassigned to temporary shoreside duties; there was no period of time in which Heiderscheid's employment with URS ended completely. *See Desper*, 342 U.S. at 189–90. Additionally, unlike in *Desper*, URS's vessels were never removed from the water and remained in navigation at all times. *Id.* at 190–91. And perhaps most importantly, Heiderscheid always

remained subject to the call of URS's vessel, a fact not true for Desper because the sightseeing boats were not in the water. *Id.* Consequently, unlike *Desper*, Heiderscheid could have been called to crew URS's vessels at any point during his temporary shoreside duties.

Two other cases provide a better analogy to Heiderscheid's circumstances. First, in *Savoie v. Otto Candies, Inc.*, 692 F.2d 363 (5th Cir. 1982), the employee, Michael Savoie, was hired to work as a deckhand aboard Otto Candies, Inc.'s vessels. *Id.* at 364. Savoie later suffered a fractured leg in an unrelated automobile accident that required a metal rod to be inserted into his leg for support; as a result, he was unable to work for about nine months. *Id.* Upon his return to work, he worked as a deckhand aboard one of Otto Candies' vessels for about three months, then left to have the metal rod removed. *Id.* Shortly thereafter, Savoie was released for light duty. *Id.* After stopping by the company office to pick up his paycheck, he accepted an offer of temporary reassignment to light duty work cleaning the company's duck blinds. *Id.* In the course of cleaning the duck blinds, Savoie refractured his leg. *Id.* at 365. He then filed suit against Otto Candies under the Jones Act, and a jury found in his favor after determining he was a "seaman" at the time of his injury. *Id.* On appeal, Otto Candies disputed the jury's finding and argued that Savoie had no vessel connection when he was injured because he was physically unable to work on a vessel and was therefore not subject to the call of the vessel. *Id.*

In affirming the ruling in Savoie's favor, the Fifth Circuit noted that it was "undisputed that Savoie was injured in the course of his employment for Candies and that he was a Jones Act seaman in Candies' employ *at some point not long before his injury*." *Id.* (emphasis added). Consequently, the fact that Savoie was performing tasks unrelated to the service of a

vessel at the time of his injury was of no consequence; rather the "crucial question [was] whether Savoie remained a seaman on" the date of injury. *Id.* (citations omitted). The court found that the evidence clearly established that he retained his seaman status when injured because he was working as a deckhand only a few days before his injury, and "[a]lthough there is no evidence of precisely how long Savoie's assignment to clean the duck blinds was to last, it is quite evident that it was not a task of extended duration[.]" *Id.* at 366. The record was simply devoid of any evidence showing that "Savoie's general pattern of employment with Candies as a deckhand was changed by the temporary assignment to clean its duck blinds." *Id.* (citing *Higginbotham*, 545 F.2d at 433). With respect to Otto Candies' claim that Savoie was physically unable to work aboard a vessel, the court noted that there was "no conclusive evidence" that Savoie could not perform "light duty" aboard a vessel. *Id.*

*Savoie* aligns neatly with the facts of this case. Much like Savoie, Heiderscheid was a deckhand shortly before his temporary assignment to shore-based duties. *See id.* at 366. Similarly, much like the assignment of cleaning duck blinds, while the length of URS's off-season was not entirely certain, Heiderscheid's temporary reassignment to shore duties "was not a task of extended duration." *Id.* Heiderscheid would be returning to URS's vessels as soon as the Mississippi's locks and dams were reopened. Indeed, much like *Savoie*, there is no evidence showing that Heiderscheid's "general pattern of employment with [URS] as a deckhand was changed by the temporary assignment" to shoreside duties, *id.*, particularly in light of the fact that Heiderscheid was always subject to the call of URS's vessels.

Second, the Fifth Circuit's decision in *Higginbotham* is instructive here. *See* 545 F.2d at 422. In that case, the Fifth Circuit addressed whether an employee who was killed in a

helicopter crash while being transported from a fixed oil rig to shore was a "seaman" at the time of his death. *Id.* at 431–32. At the time of his death, the seaman was employed on a fixed mobile drilling platform, which was not a vessel for purposes of "seaman" status. *Id.* at 432. However, the seaman had spent much of his time during the prior two years working "on submersible drilling rigs, which [were] Jones Act vessels," and the seaman was only "assigned . . . to the fixed drilling platform [] as a temporary replacement for a vacationing co-worker." *Id.* The employee's representatives argued that such facts amounted to "the status of [] seaman because of [the employee's] predominant employment on submersible drilling barges and despite temporary assignments by [his employer] to nonseaman employment." *Id.*

The Fifth Circuit agreed, noting that "uncontradicted evidence" established that "during the two years prior to his death [the employee] spent all but a small fraction of his working time on [the employer's] submersible drilling barges, and [] [the employer] assigned [the employee] to the fixed platform . . . *as a presumably temporary replacement* for a vacationing foreman." *Id.* at 433 (emphasis added). The court noted that established seamen do not lose their status merely because they "sue[] for injures received while off ship and engaged in temporary work for [their] employer unrelated to the service of the ship." *Id.* at 432 (citation omitted). Accordingly, the "undisputed evidence require[d] a finding that [the employee] was a seaman despite *intermittent temporary assignments* to fixed platforms *as the course of drilling operations* required." *Id.* (emphasis added).

Much like the employee in *Higginbotham*, Heiderscheid spent essentially all of his time on board URS's vessels prior to his temporary off-season shoreside assignment; his

shoreside duties constituted an "intermittent temporary assignment" stemming from the ebb and flow of URS's normal operating seasons.  *See id.* at 433.  When URS resumed normal operations, Heiderscheid would return to URS's vessels, much like the employee in *Higginbotham* would presumably have returned to his employer's submersible drilling stations—which qualify as vessels—when his co-worker returned from vacation.  *Id.*

Ultimately, Heiderscheid's temporary assignment to shoreside duties did not alter the fundamental nature of his work with, nor his connection to, URS's vessels.  At all times during his temporary shoreside work, Heiderscheid remained subject to the call of URS's vessels, which remained in the water and in navigation.  Moreover, 59% of the hours Heiderscheid worked while employed by URS were onboard URS vessels, in service to the vessel's mission, which far exceeds the Supreme Court's general "rule of thumb" that a worker "who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."  *Chandris, Inc.*, 515 U.S. at 371.  Accordingly, at the time of his injury, Heiderscheid remained a "seaman" for the purposes of the Jones Act.

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that URS's Motion for Partial Summary Judgment is **GRANTED**, and Heiderscheid's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**


Dated: January 21, 2020                         s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge