# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Upper River Services, L.L.C., <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> Andrew Heiderscheid, <br><br> Defendant/Counter-Claimant. | Case No. 19-cv-00242 (SRN/ECW) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Giles B. Howard and Neal W. Settergren, Goldstein & Price, L.C., One Memorial Drive, Suite 1000, St. Louis, MO 63102, for Plaintiff/Counter-Defendant.

Brett Koch, Gerald W. Bosch, and Mackenzie R. Moy, Bosch Law Firm, Ltd., 3900 Northwoods Drive, Suite 120, St. Paul, MN 55112, for Defendant/Counter-Claimant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Plaintiff Upper River Services, L.L.C.'s Motion for Summary Judgment (Doc. No. 68). Previously, the Court granted Upper River Services' motion for partial summary judgment ruling that Defendant Andrew Heiderscheid was a "seaman" at all times relevant in this case. *See Upper River Servs., LLC v. Heiderscheid*, No. 19-cv-00242 (SRN/ECW) (Doc. No. 64), 2020 WL 339139 (D. Minn. Jan. 21, 2020). Now, Upper River Services seeks summary judgment as to negligence under the Jones Act, 46 U.S.C. § 30104 (2018), and as to any obligation it may have for "maintenance and cure" under maritime law. For the following reasons, the Court **GRANTS** Upper River Services, L.L.C.'s Motion for Summary Judgment (Doc. No. 68).

1

## I.     BACKGROUND

The facts relevant to this motion are largely the same as the facts this Court considered when it granted Upper River Services' ("URS") motion for partial summary judgment.  Accordingly, the Court relies in part on the relevant factual background from its prior order, supplemented by certain record evidence specific to the issues presented in URS' present motion.

### A.     Factual Background

URS "operates two shipyards and a fleet of vessels that move barges on the Mississippi River." *Heiderscheid*, 2020 WL 339139, at *1.  Heiderscheid was employed by URS as a deckhand in the fall of 2018 until the season ended on December 20 of that year.  (Pl. Ex. A, Dep. Tr. of Andrew Heiderscheid ("Def. Depo.") [Doc. No. 70-2] at 7–8.)  Deckhands are typically laid off at the end of the season every year as operations on the locks close due to winter conditions.  *Heiderscheid*, 2020 WL 339139, at *2; (*see also* Def. Depo. at 16.)  Heiderscheid, however, was offered a temporary winter position by URS—beginning on January 7, 2019—so that he could continue working during the off-season in URS' on-shore fabrication shop, which involved different duties than those of a deckhand.  (Def. Depo. at 16; Pl. Ex. G, Def.'s Workers Compensation Hearing Testimony ("Workers' Comp. Testimony") [Doc. No. 70-8] at 97, 58–59.)  The understanding was that he would work in that role until URS' fleet resumed normal operations, at which time he would return to normal deckhand duties.  (Def. Depo. at 19.)  Heiderscheid was always paid $15 an hour  while working for URS, even though his job responsibilities changed temporarily during the winter off-season.  (*Id.* at 20.)  Although Heiderscheid received

2

training on how to work as a deckhand, he did not receive any additional training when he temporarily switched to shoreside duties.  (*Id.* at 9.)

On January 21, 2019, while working in URS' fabrication shop, Heiderscheid "picked up a piece of steel and turned to throw it into a bin, and that's when [he] felt something in his back."  (*Id.*)  He told his supervisor, Bill Fuller, when it happened, that he felt a pull in his back.  (*Id.* at 27.)  The next day, January 22, 2019, Heiderscheid worked a full 10-hour shift, but testified that it was hard for him to complete his job duties.  (*Id.* at 28–30; Workers' Comp. Testimony at 97.)  Because of Heiderscheid's difficulties, Fuller suggested he seek medical attention.  (Workers' Comp. Testimony at 65.)  That same day, Heiderscheid went to the emergency room for an "evaluation of back pain." (Pl. Ex. B, January 22, 2019 Medical Records [Doc. No. 70-3] at 1.)  According to the treating physician's notes, Heiderscheid reported that he had injured his lower back about a month earlier and was experiencing numbness in his extremities that was worsening.  (*Id.*) He was preliminarily diagnosed with back pain.  (*Id.* at 3.)

On January 29, 2019, Heiderscheid filled out a URS injury report, in which he stated that on the date of his injury, he was "lifting a [piece] of steel, cleaning the work area" in the fabrication shop when he injured his lower back.  (Pl. Ex. D [Doc. No. 70-5].)  That same day, he signed a statement explaining that he did "not have a history of back pain or injuries," that the piece of steel he lifted was "not any heavier or more awkward than any other steel or tools [he] had picked up that afternoon," that he "did not feel as if [he] needed any help lifting th[e] piece of steel [although his supervisor] was available if [he] had needed help," and that he did "not feel as if [URS] did anything to cause [his] injury."  (Pl.

Ex. C [Doc. No. 70-4].)  Heiderscheid's position on this statement has been inconsistent. In his deposition, for example, Heiderscheid testified that "no one told him what to write" in the statement and that he filled out the injury report on his own.  (Def. Depo. at 33–35.) However, in his workers' compensation hearing, Heiderscheid said that he was not involved in drafting the statement he signed and believed that an employee at URS drafted it.  (Workers' Comp. Testimony at 70, 111.)  Nevertheless, Heiderscheid confirmed that the information contained in his signed statement was truthful.  (*Id.*)

On the same day that Heiderscheid filled out the URS injury report and signed the statement explaining what had happened (January 29), URS terminated him for allegedly misrepresenting the cause and date of his injury.  (*See* Workers' Comp. Testimony at 72–73.)  At the time of his termination, URS had already been provided with Heiderscheid's initial emergency room visit notes.  (*Id.*)  Notably, both the January 22, 2019 hospital visit records, as well as Heiderscheid's sworn testimony before a Minnesota workers' compensation judge, make clear that Heiderscheid was suffering from back pain about four weeks *before* his alleged January 21 injury.  (January 22, 2019 Medical Records at 3; Workers' Comp. Testimony at 60–61.)   During the workers' compensation hearing, Heiderscheid attempted to explain the discrepancy in the evidence by offering a few possible explanations for his earlier back pain: (1) the earlier back pain was in a different part of his back; (2) the earlier pain had subsided by the time he went back to work on January 7; (3) the earlier pain had been occurring while he was still working as a deckhand in November; or (4) the reference to earlier back pain was mistakenly entered into the medical notes.  (Workers' Comp. Testimony at 61, 63, 103–105.)  Still, Heiderscheid

4

provides no medical expert testimony differentiating between the cause of any of the back pain at issue. (Pl. Ex. I, Def.'s Am. Resp. to Pl.'s First Req. for Production ("Def.'s Am. Resp. for Prod.") [Doc. No. 70-10] at 3.)

On January 31, 2019, Heiderscheid visited HealthEast Neurosurgery, and reported weakness and numbness in both legs, as well as gait and balance issues. (Pl. Ex. E, January 31, 2019 HealthEast Neurosurgery Records [Doc. No. 70-6] at 1.) He was diagnosed with Cauda Equina Syndrome, a condition involving a bundle of "spinal nerve roots . . . below the first lumbar" and characterized by "pain, paresthesia, and weakness[.]"[1] (*Id.* at 1.) The condition was apparently caused by a large herniated disc "at L4-5[.]" (*Id.* at 4.) On February 1, 2019, Heiderscheid underwent lower back disc surgery to remove the offending disc. (January 31, 2019 HealthEast Neurosurgery Records at 2; Pl. Ex. F, February 1, 2019 HealthEast Surgical Report [Doc. No. 70-7] at 3.) For about a week after the surgery, he had difficulty walking, and did not fully recover for at least a month. (Def. Depo. at 100, 104.)

On March 11, 2019, Heiderscheid started a new position at Tradesmen International, earning a higher salary than he was earning with Upper River Services. (Workers' Comp. Testimony at 77; Def. Depo. at 65–67.) At both his workers' compensation hearing and his deposition, Heiderscheid testified that he had not paid any of his medical bills out-of-

---

[1] Cauda Equina Syndrome occurs "when the nerve roots of the cauda equina are compressed and disrupt motor and sensory function . . . ." *Cauda Equina Syndrome*, Am. Ass'n Neurological Surgeons, https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Cauda-Equina-Syndrome (last visited Aug. 24, 2020).

pocket and, to date, he has not provided any records indicating otherwise.  (Def. Depo. at 64; Workers' Comp. Testimony at 77–78.)

A few other background facts are worth noting here.  The record is silent as to whether Heiderscheid filed for unemployment following his termination, and the only pay stubs in the record relate to Heiderscheid's work with URS up until the date of his injury. (*See generally* Def.'s Am. Resp. for Prod.; Def. Ex. 3, Wage R. from URS [Doc. No. 74-4].)  The last pay period Heiderscheid was on URS' payroll was between January 26 and February 1, during which he worked 20 hours.  (Wage R. from URS at 4.)

Up until his termination by URS on January 29, 2019, Heiderscheid testified that he was living in a halfway house, but moved into a new apartment on January 29 and paid rent at $575 a month.  (Def. Depo. at 93, 124.)  On July 1, 2019, Heiderscheid moved to a different apartment where he testified that his rent was $500 per month plus utilities. (*Id.* at 93, 123–124.)

### B.    Procedural History

On January 31, 2019, Heiderscheid filed a Claim Petition seeking workers' compensation benefits with the Minnesota Office of Administration Hearings.  *See Heiderscheid*, 2020 WL 339139, at *2.  The next day, on February 1, 2019, URS filed the present declaratory judgment action seeking a declaration that Heiderscheid was "employed as a seaman governed by federal maritime law," and further, that URS was not liable for any negligence or maintenance and cure stemming from Heiderscheid's alleged

injury.  (Compl. [Doc. No. 1] at ¶ 15(b.).)[2]  On May 24, 2019, Heiderscheid filed an answer to URS' complaint, which he subsequently amended on June 10.  (*See* Answer [Doc. No. 24]; Am. Answer [Doc. No. 26].)  In his Amended Answer, Heiderscheid denies his status as a seaman, claims that he was a land-based laborer at the time of his injury, and argues that he is entitled to state workers' compensation benefits.  (Am. Answer ¶¶ 5–12.)  In the alternative, he argues that, if he were found to be a seaman for the purposes of federal maritime law, URS is negligent under the Jones Act, and he is owed maintenance and cure for his injuries.  (*Id.* at Doc. P. 5–6.)

On June 12, 2019, a Minnesota workers' compensation judge dismissed Heiderscheid's workers' compensation claim petition for lack of subject matter jurisdiction, noting that if Heiderscheid was found to be a seaman, the Jones Act would provide the exclusive remedy for his injury, barring him from seeking state workers' compensation benefits.  *Heiderscheid*, 2020 WL 339139, at *2.  The judge's dismissal was without prejudice should Heiderscheid later be found to be a non-seaman.  *Id.*

On June 19, 2019, URS filed an answer to Heiderscheid's counterclaim denying his claim and asserting that he had failed to disclose—and in fact misrepresented—his medical condition, failed to mitigate his damages, "[had] not incurred any medical expenses or living expenses" resulting from his injury, and that his injury was caused "in whole or in

---

[2]   On February 25, 2019, Heiderscheid filed a motion to dismiss URS' complaint, alleging that URS' claim improperly relied on federal maritime law and was an abuse of the Declaratory Judgment Act.  (*See* Def.'s Mem. in Supp. of Mot. to Dismiss [Doc. No. 11].)  The motion was argued and denied on the record on May 10, 2019.  (*See* Minute Entry [Doc. No. 20].)

party by [his] own negligence, or constituted a preexisting condition. (Def. Answer to Countercl. [Doc. No. 27] ¶¶ 6–15.)

On November 22, 2019, URS filed a motion for partial summary judgment, seeking a determination that Heiderscheid was a seaman at the time of his injury. (*See* Pl.'s Mot. for Partial Summ J. [Doc. No. 45].) Heiderscheid opposed the motion and filed a motion for summary judgment on the same issue. (Def.'s Mot. for Summ. J. [Doc. No. 55].) On January 21, 2020, the Court granted URS' motion for partial summary judgment, denied Heiderscheid's motion for summary judgment, and held that Heiderscheid was a seaman at the time of his injury. *See Heiderscheid*, 2020 WL 339139, at *9.

On May 8, 2020, URS filed the present motion for summary judgment seeking judgment as a matter of law that it is not liable to Heiderscheid for negligence under the Jones Act, unseaworthiness, or maintenance and cure under federal maritime law. (*See* Pl. Mot. for Summ. J.) Heiderscheid opposes the motion, although he has conceded that he is no longer pursuing any claim for unseaworthiness. (*See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n Mem.") [Doc. No. 74].)

## II.    DISCUSSION

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit," which is determined by the substantive law governing the dispute. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Similarly, an issue of material fact is

"genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Initially, the moving party bears the burden of establishing a lack of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, the nonmoving party has "the benefit of all reasonable inferences which may be drawn without resorting to speculation." *Johnson v. Securitas Sec. Services USA, Inc.* 769 F.3d 605, 611 (8th Cir. 2014). If "the nonmoving party will bear the burden of proof at trial on a dispositive issue," however, the moving party has met its summary judgment burden after the "pleadings, depositions, answers to interrogatories and admissions on file" do not sufficiently prove the nonmoving party's claim. *Catrett*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). In order to defeat summary judgment, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)). Put succinctly, if, after the moving party has met its burden to establish the lack of a genuine issue of material fact, and the nonmoving party fails to "make a sufficient showing on an essential element of [the] case with respect to which [it has] the burden of proof," then the "moving party is entitled to a judgment as a matter of law." *Id.* (citation omitted).

As the Court previously ruled, "at the time of his injury, Heiderscheid [was] a 'seaman' for purposes of the Jones Act." *Heiderscheid*, 2020 WL 339139, at *9. Under the Jones Act, "a maritime employee who qualifies as a 'seaman' is granted the right (to the exclusion of other rights) to pursue his or her employer for negligence when he is injured in the 'course of employment.'" *Id.* at *4 (citing 46 U.S.C. § 30104). Similarly,

9

under general maritime law, a seaman is entitled to maintenance and cure if injured while working. *See In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 857 n.9 (8th Cir. 2010) (noting that "maintenance and cure" are contractual forms of compensation provided under general maritime law to a seaman who falls ill while in the service of his vessel) (citation omitted).

Accordingly, the issue before the Court is whether URS has shown that there is no genuine issue of material fact in dispute that Heiderscheid is not entitled to damages for (1) negligence under the Jones Act and (2) maintenance and cure under maritime law. (*See generally* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") [Doc. No. 70]; Def.'s Opp'n Mem.) The Court will address each issue in turn.

### A.    Jones Act Negligence

Under the Jones Act, "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. The Act provides "a cause of action in negligence" for any seaman injured in the course of employment, "and incorporates by reference the judicially-developed doctrine of liability under the Federal Employer's Liability Act ("FELA") . . . thereby according seamen rights parallel to those of railway employees." *Dise v. Express Marine, Inc.*, 476 Fed. App'x 514, 518 (4th Cir. 2011) (citations omitted); *see also Lee v. Nacher Corp.*, 362 F. Supp. 3d 359, 368 (E.D. La. 2019). In order to establish a claim for negligence under the Jones Act, Heiderscheid, as a seaman, must show that (1) "he suffered an injury in the course of his employment"; (2) URS "was negligent"; and (3) URS'

10

"negligence caused his injury, at least in part." *Bartoe v. Missouri Barge Line Co. Inc.*, 635 F. Supp. 2d 1020, 1034 (E.D. Mo. 2009) (citation omitted).

It is well understood that, for the purposes of the Jones Act, "negligence is 'conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.' " *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999) (citation omitted). In determining whether an employer has acted negligently under the Jones Act, courts look to the common-law elements of "duty, breach, and injury[,]" although in the Jones Act context "the element of causation is relaxed" and many "common law defenses" are inapplicable. *Id.* Still, under common law principles of negligence, the injured employee must still "establish the breach of a duty to protect against foreseeable risks of harm." *Id.* If the employer's negligence "played any part, even the slightest, in producing the injury," the employer can be held liable. *Alholm v. Am. Steamship Co.*, 144 F.3d 1172, 1178 (8th Cir. 1998) (citing *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 523 (1957)). Importantly, however, "the negligence of the worker and the possibility of a safe alternative may be considered when a seaman is ordered to do a task but is not instructed on the method to use and he acts negligently despite the availability of an alternative." *Id.* at 1179.

URS argues that it is entitled to summary judgment declaring that it is not liable for Jones Act negligence because Heiderscheid has failed to (1) provide any evidence showing that URS breached a duty owed to him, including evidence related to any lack of training; or (2) provide evidence showing his injury was caused by URS' alleged breach of its duty to Heiderscheid. (Pl.'s Mem. at 9–13.) URS notes that in his signed statement,

Heiderscheid himself asserted that he did not believe URS had done anything to cause his injury.  (*Id.* at 9–10.)  Moreover, he concedes that there was equipment available to help lift heavy objects—equipment that he had used previously.  (*Id.*)  URS also notes that Heiderscheid testified that he did not believe his injury was due to a lack of equipment or a lack of manpower.  (*Id.* at 10.)  At most, URS notes, Heiderscheid argues that perhaps a stretching routine could have been put in place by URS to mitigate the risk of injuries.[3] (*Id.* at 10–11.)  With respect to causation, URS argues that Heiderscheid fails to provide any medical or expert testimony showing that his act of lifting a 35-pound piece of steel on January 21 was the cause of his back injury, and that because causation in this case is not "obvious to laymen[,]" such evidence was required.  (*Id.* at 12–13.)

In response, Heiderscheid argues that URS breached its duty to provide adequate training as to how to lift heavy objects, including how to use lifting equipment or knowing when to ask for help.  (Def.'s Mem. at 3.)  He also argues, with respect to causation, that URS is making his medical condition sound more complex than is necessary, that he suffered from an "obvious back injury[,]" and that the causal connection should be "left for the finder of fact." (*Id.*)

The Court finds that URS has established that there is no genuine dispute of material fact that Heiderscheid has failed to show that URS breached a duty owed to him, or that URS caused his injury.  With respect to duty, the standard of care owed by URS to

---

[3]     Heiderscheid stated in his deposition that information on stretching could have been helpful, but offers no evidentiary support beyond his own speculation in support of that statement. (Def. Depo. at 92.)

Heiderscheid is the same as that owed under an ordinary negligence claim: "that of a reasonable person under the circumstances." *Douglas v. Chem. Carriers Towing, LLC*, 409 F. Supp. 3d 570, 575 (E.D. La. 2019). URS has demonstrated that the record is devoid of any evidence from which a jury could even infer that it acted unreasonably in relation to Heiderscheid's injury for several reasons. First, Heiderscheid himself stated in a signed statement that he did not believe that URS had done anything wrong to cause his injury. (*See* Pl. Ex. C.) Second, he later confirmed that same position in his deposition. (*See* Def. Depo. at 25.) Third, Heiderscheid testified that he was aware that URS had equipment available for lifting heavy objects, that he knew how to use the equipment, and that he had used that equipment before to lift steel. (Def. Depo. at 24–25; 90–91.) Finally, he explained that when attempting to lift the 35-pound piece of steel on January 21, 2019, the only reason Heiderscheid did not use URS' available equipment or ask for help from other available employees was because he thought he did not need help. (*Id.* at 24.) In fact, he testified that he routinely lifted things "a lot heavier than that 35-pound piece of steel." (*Id.* at 24–25.) In the face of such evidence, Heiderscheid's unsupported speculation that the lack of a "stretching routine" as other training might "possibly" have prevented this injury does not raise a dispute as to a genuine issue of material fact. *See Brown v. Reinauer Transp. Cos., L.P.*, No. 16-cv-03998 (LDH) (PK), 2018 WL 9986677, at *2 (E.D.N.Y. Sept. 26, 2018) (noting that an employee's Jones Act negligence claim "cannot be supported by mere surmise, speculation or conjecture" (citations omitted) (internal quotation marks omitted)).

Moreover, there is simply no evidence in the record that any lack of care on the part of URS caused Heiderscheid's injury.  While it is "well settled that expert testimony is unnecessary in [Jones Act] cases where jurors 'are capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training[,]' " it is equally settled that where "the nexus between the injury and the alleged cause would not be obvious to the lay juror, '[e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.' " *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (citations omitted), *cert. denied*, 546 U.S. 822 (2005).  Accordingly, "where an injury has multiple potential etiologies, expert testimony is necessary to establish causation, even in view of the plaintiff's reduced [Jones Act] burden to prove causation." *Id.* (citations omitted).  At the very least, "a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages." *Hancock v. Diamond Offshore Drilling, Inc.*, No. 07-3200, 2008 WL 3501015, at *4 (E.D. La. Aug. 8, 2008) (citation omitted).

Here, Heiderscheid has failed to provide *any* medical testimony establishing that (1) URS' negligence caused his injury; or (2) that his injury stemmed from the January 21, 2019 event.  Far from being obvious, it is unclear if the injury Heiderscheid sustained stems from the act of lifting the 35-pound piece of steel on January 21 or from some earlier injury.  If Heiderscheid had no history of back pain or injury leading up to the incident on January 21, 2019, the injury would perhaps be obvious to a juror and not require medical testimony.  The record here, however, tells a different story.  According to the medical records from

14

his January 22, 2019 visit to the emergency room, Heiderscheid reported that he had "injured his lower back ~1 month" *before* the January 21 accident.  (*See* Pl. Ex. B at 1.) On January 27, at a follow-up visit, he further reported that he had been experiencing lower back pain "with numbness and pain in [his] bilateral lower extremities . . . for about a month" but that six days prior he had felt a pop and thought he had "herniated his disc" that day.  (Def.'s Ex. 1 [Doc. No. 74-2] at 8.)  The medical records from those visits do not recount a lifting accident as the source of his injury.  It was not until Heiderscheid attended a neurosurgery consultation on January 31 that any medical records indicate that Heiderscheid reported the source of his injury as "[l]ifting steel at work and [he] felt a pop." (*Id.* at 13.)

Accordingly, based on the evidence in the record, Heiderscheid's injury does not obviously stem from the January 21 accident.  "Because the type of injury [Heiderscheid] suffered [has] no obvious origin, 'expert testimony is necessary to establish even that small quantum of causation required by [the Jones Act]."  *Brooks v. Union Pac. R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010) (noting, in the parallel FELA context, that where the source of a back injury was not obvious, medical testimony was necessary to survive summary judgment on causation).  Heiderscheid offers no such testimony.  Indeed, the record lacks any testimony from any medical professional at all.  Accordingly, he has not established a genuine issue of material fact in dispute for trial on the issue of causation.  *See Hancock*, 2008 WL 3501015, at *4 (citation omitted).

In summary, the Court finds that URS is not liable to Heiderscheid for Jones Act negligence. To the extent Heiderscheid's counterclaim asserts a Jones Act negligence claim, it is therefore dismissed with prejudice.

### B.      Maintenance and Cure

The Court now turns to whether URS owes Heiderscheid maintenance and cure for his injury. A claim for maintenance and cure is distinct from a negligence claim under the Jones Act. *See The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2286 (2019). Maintenance and cure "concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) (citation omitted). A maintenance and cure claim includes "three specific items of recovery: (1) maintenance, which is a living allowance; (2) cure, which covers nursing and medical expenses[;] and (3) wages." *Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1122 (11th Cir. 1995) (citation omitted). "It is settled law that wages is a basic component of an award of maintenance and cure" such that if a seaman is entitled to maintenance and cure, he or she is also entitled to unearned wages. *Archer v. Trans/Am. Servs., Ltd.*, 834 F.2d 1570, 1574–75 (11th Cir. 1988) (citation omitted).

The duty imposed on an employer to provide maintenance and cure "arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment." *Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975) (citation omitted). Moreover, the duty is quite broad; even "negligence or acts short of culpable misconduct on the seaman's part will not relieve (the shipowner) of the responsibility." *Id.* To that end, any ambiguities or doubts about

maintenance and cure are to be resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962) (citing *Warren v. United States*, 340 U.S. 523 (1951)). That said, a seaman is entitled to maintenance and cure only "until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962).

Before recovering maintenance and cure, the seaman "bears the burden of establishing: (1) his engagement as a seaman; (2) his illness or injury occurred, was aggravated or manifested itself while in the ship's service; (3) the wages to which he may be entitled; and (4) the expenditures or liability incurred by him for medicine, nursing care, board and lodging." *Smith v. Basic Marine Servs., Inc.*, 964 F. Supp. 2d 597, 608 n.19 (E.D. La. 2013) (citation omitted). The Court addresses maintenance, cure, and wages in turn.

### 1.   Maintenance

The Court first addresses maintenance. URS argues that Heiderscheid is not entitled to maintenance because he has failed to provide any evidence substantiating his alleged expenses for board and lodging, and so the Court lacks an evidentiary basis to estimate any such costs. (Pl.'s Mem. at 15–16.) Moreover, the record suggests that he was a resident in a halfway house at the time of the accident and did not incur any rent obligation until after he was fired by URS on January 29. (Defs. Depo. at 93, 124.) Heiderscheid, in response, simply argues that his own testimony—alone—without any documentary support as to the cost of room and board, is sufficient to establish his right to maintenance. (Def.'s Opp'n Mem. at 6.)

17

"[A] seaman[] seeking maintenance 'is entitled to the reasonable cost of food and lodging, provided he has incurred the expense.' " *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 540 (9th Cir. 2018) (quoting *Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 587 (5th Cir. 2001)).  However, the "burden is on the [seaman] to 'present evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs.' " *Id.* (quoting *Hall*, 242 F.3d at 590).  While this burden is "feather light[,]" such that "a court may award reasonable expenses[] even if the precise amount of actual expenses is not conclusively proved[,]" if the seaman "presents *no evidence* of actual expenses . . . [the seaman] may not recover maintenance." *Id.* (quoting *Hall*, 242 F.3d at 588 & 590 (emphasis added)).

Here, Heiderscheid offers no documentation as to any food or lodging expenses following his injury and before URS terminated him.  He has provided no receipts for rent, food, utilities, or any other lodging-related expense he might have accrued, despite URS' request for such documentation.  (*See* Def.'s Am. Resp. for Prod. at 4 (noting URS requested rent and utility bills, to which Heiderscheid responded that the "documentation has been requested and will be provided upon receipt").  This total lack of documentary evidence renders it impossible for the Court to estimate Heiderscheid's actual costs, if any. *Barnes*, 889 F.3d at 540 (quoting *Hall*, 242 F.3d at 590).

Heiderscheid argues that his own testimony—that he was paying $575 per month in rent (*see* Def. Depo. at 93)—without any documentary support, is sufficient to support an award of maintenance, citing to *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986).  (*See* Def.'s Opp'n Mem. at 6.)  However, such a bare allegation without

any detail, basis or proof in the record, is simply not sufficient to justify an award of maintenance.[4]  When asked to provide proof of these expenses, Heiderscheid stated that documentation "had been requested and [would] be provided upon receipt."  (Def.'s Am. Resp. for Prod. at 4.)  Yet Heiderscheid has never supplemented the record with any such evidence.

In sum, Heiderscheid has presented no real evidence of any actual living expenses and, accordingly, may not recover maintenance.  *See Barnes*, 889 F.3d at 540 (quoting *Hall*, 242 F.3d at 588 & 590).  The Court grants URS' motion with respect to maintenance. To the extent Heiderscheid's counterclaim seeks maintenance, it is dismissed with prejudice.

### 2.    Cure

The Court now turns to whether Heiderscheid is entitled to cure.  URS argues that Heiderscheid is not entitled to cure because he has received all the medical care he needs,

---

[4]     *See Owens v. Abdon Callais Offshore, LLC*, No. 10-cv-3296, 2011 WL 2443687, at *6 (E.D. La. June 14, 2011) (noting the seaman had submitted an affidavit with receipts and bills summarizing actual monthly expenses); *Martin v. Abdon Callais Offshore, LLC*, No. 10-cv-3043, 2011 WL 1982859, at *4 (E.D. La. May 20, 2011) (noting seaman had submitted detailed testimony summarizing, to the penny, his monthly living costs); *Mier v. Wood Towing, L.L.C.*, No. 08-cv-4299, 2010 WL 2195700, at *5 (E.D. La. May 28, 2010) (same); *St. John v. Epic Divers, Inc.*, No. 05-cv-1503, 2005 WL 8174193, at *3 (E.D. La. Dec. 7, 2005) (denying motion to increase maintenance based on seaman's unsworn statement that he incurred $1095 per month in living expenses); *McNeil v. Jantran, Inc.*, 258 F. Supp. 2d 926, 931–32 (W.D. Ark. 2003) (noting that the seaman must submit evidence of his "actual and necessary living expenses during convalescence" which is satisfied by an affidavit itemizing monthly expenses); *Miller v. Canal Barge Co., Inc.*, No. Civ. A. 00-0526, 2000 WL 33389203, at *1 (E.D. La. Aug. 23, 2000) (noting that evidence of "actual expenditures for living expenses can be of even greater probative value" than a seaman's own testimony, and finding seaman had made prima facie showing as to maintenance based on "affidavit and attached receipts" showing actual living expenses).

and because he has not incurred any out-of-pocket costs for that care.  (Pl.'s Mem. at 14–15.)  In response, Heiderscheid asserts that, because the hospital that provided him medical care could not intervene in his workers' compensation case (due to its dismissal), Heiderscheid might now be liable for $45,785.12, the cost of his medical care.  (Def.'s Opp'n Mem. at 6.).

As noted above, "the . . . doctrine of cure obligates the shipowner or operator to reimburse medical expenses actually incurred [by a seaman] and to ensure that the seaman receives the proper treatment and care." *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (citation omitted).  If a seaman incurred no expense or liability for his care and support, however, an award of cure is not warranted.  *Johnson v. United States*, 333 U.S. 46, 50 (1948).

Here, Heiderscheid testified—before a workers' compensation judge and in his deposition—that he received all the medical care he wanted related to his January 21 accident, and that he had not paid any of those medical expenses out-of-pocket because his health insurance covered the costs.  (Def. Depo. at 59, 64; Workers' Comp. Testimony at 77–78.)  Accordingly, he has not incurred any out-of-pocket cost for healthcare, and is owed no cure from URS.  *See Johnson*, 333 U.S. at 50.

Heiderscheid's argument that he is now potentially personally liable for the medical costs paid by his health insurer is puzzling at best.  First, there is no evidence in the record that his health insurer has made a claim against him, by formally intervening in this case, or otherwise.  Second, the record is devoid of any medical bills or other evidence of the amount of medical expenses he incurred in connection with the January 21 incident.  In the

absence of any evidence whatsoever, URS does not owe any cure to Heiderscheid.  The Court grants URS's motion as to cure and, to the extent that Heiderscheid's counterclaim seeks cure, it is dismissed with prejudice.

### 3.    Wages

The Court now turns to whether URS is obligated to pay wages to Heiderscheid. Heiderscheid argues that he is owed unearned wages for what he describes as the "definite period of time" between the date of his injury and the date when Heiderscheid's temporary shoreside work would have ended (i.e. the start of a new season on the Mississippi river). (Def.'s Opp'n Mem. at 5–6.)  URS does not respond to this claim other than to assert that, because Heiderscheid only sought wages for the first time in his opposition to URS' motion for summary judgment, he should be barred from seeking wages now.  (URS Reply Mem. [Doc. No. 75] at 11 n.3.)

The Court need not determine whether Heiderscheid is barred from seeking wages as a procedural matter because the Court finds, even if he could seek wages, he has failed to provide any evidence as to wages to which he might be entitled.  "Unearned wages are measured from the time of the seaman's incapacity until the end of his employment contract." *Flores*, 47 F.3d at 1122 (citation omitted).  This time period could span the time from the date of injury until the end of a particular voyage (if applicable), or some other defined period contained within an employment contract.  *See Berg v. Fourth Shipmor Assocs.*, 82 F.3d 307, 309 (9th Cir. 1996) (noting that a period of employment is often either the length of a voyage or some other contract-based time period).

Here, Heiderscheid was not injured while on a voyage, and the record contains no evidence of a contract showing Heiderscheid was to be employed until a certain date. Heiderscheid argues that the period of time for which he is owed wages stems from the date of his injury (January 21) to the date URS resumed normal river operations in the spring of 2019.  (Def.'s Opp'n Mem. at 6.)  However, the record suggests that URS terminated his employment on January 29—eight days after the incident—due to his dishonesty in connection with reporting the incident.  (*See* Workers' Comp. Testimony at 72–73.)  And it appears that he was paid from the date of the incident until the date of his termination.  (*See* Defs. Depo. at 28–30; Workers' Comp. Testimony at 97; Wage R. from URS at 4.)  Without any evidence establishing the amount of any unearned wages, the Court lacks sufficient evidence to award any unearned wages.  Accordingly, the Court grants URS' motion for summary judgment with respect to wages.

Finally, the Court addresses URS' argument that it is entitled to summary judgment on Heiderscheid's counterclaim that URS' allegedly callous and willful refusal to pay maintenance and cure warrants an award of punitive damages and attorneys' fees.  (*See* Am. Answer at 6.)  "[P]unitive damages and attorneys' fees are 'proper only when a company's refusal to pay [maintenance and cure] is callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent.  The shipowner must have refused to pay without a reasonable defense and exhibited callousness and indifference to the seaman's plight.' "  *Johnson v. Am. Interstate Ins. Co.*, No. 6:08-cv-1988, 2010 WL 3802451, at *1 (W.D. La. Sept. 20, 2010).

The Court finds that URS is entitled to summary judgment on Heiderscheid's attorneys' fees and punitive damages claim.  As an initial matter, because the Court has found that there is no genuine issue of material fact in dispute that Heiderscheid is not entitled to maintenance and cure, this claim cannot survive.  Moreover, Heiderscheid has offered no evidence of callousness on the part of URS with respect to its refusal to pay maintenance and cure.  To the contrary, Heiderscheid testified that when he spoke with URS employees about his injury, the employees sought to understand what had happened to him and treated him with respect at all times during the injury-reporting process.  (Def. Depo. at 32–33.)  Furthermore, there is no evidence that URS was "lax" in investigating his claim, or that it lacked a reasonable defense to his claim.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Upper River Services, L.L.C.'s Motion for Summary Judgment (Doc. No. 68) is **GRANTED**, and Defendant Andrew Heiderscheid's Counterclaim (Doc. No. 26) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: August 25, 2020                                  s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge